## GORDON ET AL. *v.* UNITED STATES.

No. 182.  Argued December 17–18, 1952.—Decided Feb. 2, 1953.

*George F. Callaghan* and *Maurice J. Walsh* argued the cause and filed a brief for petitioners.

*John R. Wilkins* argued the cause for the United States.  With him on the brief were *Solicitor General Cummings, Assistant Attorney General Murray* and *Beatrice Rosenberg.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioners Gordon and MacLeod were convicted on an indictment of four counts, two charging unlawful possession of goods stolen while in interstate commerce[1] and two that defendants caused this property to be further transported in interstate commerce.[2] The Court of Appeals affirmed,[3] and we granted certiorari limited to questions concerning production and admission of documentary evidence tending to impeach the testimony of a prosecution witness.[4]

The Government proved that film being shipped from Rochester, New York, to Chicago, Illinois, was stolen from a truck in Chicago and that part of it later had been recovered in Detroit. To implicate the two petitioners, it relied principally on one Marshall, who, in Detroit, had pleaded guilty to unlawful possession of the film. Marshall testified that he and a codefendant, Swartz, who died before trial, on several occasions had driven from Detroit to Chicago and back. On each visit they had stopped at petitioner Gordon's Chicago jewelry store. On one trip, according to Marshall, Gordon accompanied them to a garage in that city and there Gordon and a man resembling MacLeod helped to load into Marshall's car film that was stacked in the garage. A week later, Marshall said, he and Swartz again called on Gordon, when the latter sent them to see "Ken" at an address which he wrote on a piece of paper. At this address, MacLeod identified himself as "Ken," and again the three men loaded film from the garage into Marshall's car.

---

[1] 18 U. S. C. (Supp. V) § 659.
[2] 18 U. S. C. (Supp. V) § 2314.
[3] 196 F. 2d 886.
[4] 344 U. S. 813.

Partial corroboration of Marshall was supplied by a Federal Bureau of Investigation agent, who had been watching the garage. He testified that on the latter occasion he saw Marshall and Swartz drive up to MacLeod's address, whereupon MacLeod removed an old truck from the garage. Later, Swartz and Marshall drove away with film cartons stacked on the back seat of Marshall's car.

Both petitioners took the stand and denied complicity in the theft and knowledge that the film was stolen. While their physical movements as recited by them were not materially different from those related by government witnesses, petitioners gave a different and innocent version of the relationship of their acts to the criminal transactions. Gordon testified that the deceased Swartz was a business acquaintance who asked on the first visit if Gordon knew of a garage where a truck could be temporarily stored. Gordon called MacLeod, who was his partner in a rooming-house venture, and told him that he would send two men over who wished to use a garage back of the rooming house. MacLeod testified that he had not known either of the men before they placed a truck in the garage and that, at their request, he had helped load film from the truck into Marshall's car merely as a favor.

On cross-examination, Marshall admitted that between his apprehension and his final statement to the Government, which implicated petitioners, he had made three or four statements which did not. Petitioners requested the trial judge to order the Government to produce these earlier statements. The request was denied. Marshall also admitted that, one week before he made any statement incriminating petitioners, he had pleaded guilty to unlawful possession of the film in a federal court in Detroit. He was still unsentenced and no date for sentencing had been set, although nine months had elapsed since this plea was received. He denied that he had received

any promise of immunity or threats which would influence him to testify as he did. Petitioners then sought to introduce from the transcript of the Detroit proceeding this statement made to Marshall by the federal district judge: "Very well, the plea of guilty is accepted. Now, I am going to refer your case to the Probation Department for presentence report. I think I should say to you, as I said to your lawyer yesterday when he and Mr. Smith called upon me in chambers yesterday morning, that it seemed to me that if you intended to plead guilty and expected a recommendation for a lenient sentence or for probation from the Probation Department, that it would be essential that you satisfy the Probation Department that you have given the law enforcement authorities all the information concerning the merchandise involved in this proceeding. . . . I am not holding out any promises to you, but I think you would be well advised to tell the probation authorities the whole story even though it might involve others." This was excluded on the objection that it was immaterial.

The trial judge in his charge and the Court of Appeals in its opinion [5] recognized that, where, as here, the Government's case may stand or fall on the jury's belief or disbelief of one witness, his credibility is subject to close scrutiny. But the question for this Court is whether rejection of petitioners' two efforts to impeach the credibility of Marshall did not withhold from the jury information necessary to a discriminating appraisal of his trustworthiness to the prejudice of petitioners' substantial rights. The two issues stand on somewhat different grounds.

The request by the accused to order production of Marshall's earlier statements was cast in terms of obtaining access to documentary evidence rather than an offer

---

[5] 196 F. 2d 886, 888.

that would require a ruling on its admissibility. But the Government apparently concedes, as we think it must, that if it would have been prejudicial error for the trial judge to exclude these statements, had the defense been able to offer them, it was error not to order their production. The relation of admissibility to production for inspection is by no means settled in the various jurisdictions, but we conclude that the Government does not concede enough. Demands for production and offers in evidence raise related issues but independent ones, and production may sometimes be required though inspection may show that the document could properly be excluded.

In the absence of specific legislation, questions of this nature are governed "by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." [6] Apparently, earlier common law did not permit the accused to require production of such documents. [7] Some state jurisdictions still recognize no comprehensive right to see documents in the hands of the prosecution merely because they might aid in the preparation or presentation of the defense. [8] We need not consider such broad doctrines in order to resolve this case, which deals with a limited and definite category of documents to which the holdings of this opinion are likewise confined.

By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main

---

[6] *Funk* v. *United States,* 290 U. S. 371; Fed. Rules Crim. Proc., 26.

[7] 6 Wigmore on Evidence, § 1859g.

[8] 2 Wharton's Criminal Evidence (11th ed.) § 785.

issue being tried: the participation of the accused in the crime. The demand was for production of these specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up.[9] Nor was this a demand for statements taken from persons or informants not offered as witnesses.[10] The Government did not assert any privilege for the documents on grounds of national security, confidential character, public interest, or otherwise.

Despite some contrary holdings on which the courts below may have relied, we think their reasoning is outweighed by that of highly respectable authority in state and lower federal courts in support of the view that an accused is entitled to the production of such documents.[11] Indeed, we would find it hard to withstand the force of Judge Cooley's observation in a similar situation that "The State has no interest in interposing any obstacle to the disclosure of the facts, unless it is interested in convicting accused parties on the testimony of untrustworthy persons."[12] In the light of our reason and experience, the better rule is that upon the foundation that was laid the court should have overruled the objections which the Government advanced and ordered production of the documents.

---

[9] As to the pretrial discovery stage, compare Fed. Rules Civ. Proc., 34, with the narrower provisions of Fed. Rules Crim. Proc., 16.

[10] In *Goldman* v. *United States*, 316 U. S. 129, the notes sought to be inspected had neither been used in court, nor was there any proof that they would show prior inconsistent statements.

[11] *Asgill* v. *United States*, 60 F. 2d 776; *United States* v. *Krulewitch*, 145 F. 2d 76, 79; *People* v. *Davis*, 52 Mich. 569, 18 N. W. 362; *State* v. *Bachman*, 41 Nev. 197, 168 P. 733; *People* v. *Schainuck*, 286 N. Y. 161, 164, 36 N. E. 2d 94, 95–96; *People* v. *Walsh*, 262 N. Y. 140, 186 N. E. 422.

[12] *People* v. *Davis*, 52 Mich. 569, 573, 18 N. W. 362, 363.

The trial court, of course, had no occasion to rule as to their admissibility, and we find it appropriate to consider that question only because the Government argues that the trial judge, in the exercise of his discretion, might have excluded these prior contradictory statements and, since that would not have amounted to reversible error, it was not such to decline their production. We think this misconceives the issue. It is unnecessary to decide whether it would have been reversible error for the trial judge to exclude these statements once they had been produced and inspected.[13] For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule; for rarely can the trial judge understandingly exercise his discretion to exclude a document which he has not seen, and no appellate court could rationally say whether the excluding of evidence unknown to the record was error, or, if so, was harmless. The question to be answered on an application for an order to produce is one of admissibility under traditional canons of evidence, and not whether exclusion might be overlooked as harmless error.

The Court of Appeals affirmed on the ground that Marshall's admission, on cross-examination, of the implicit contradiction between the documents and his testimony removed the need for resort to the statements and the admission was all the accused were entitled to demand. We cannot agree. We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing

---

[13] We note in passing that the rules relating to impeachment by prior self-contradiction, which provide that such contradiction may be shown only on a matter material to the substantive issues of the trial, contain within themselves a guarantee against multiplication and confusion of issues. Therefore the discretion of the trial judge in excluding otherwise admissible evidence of this type is not as wide as it is in the vague and amorphous area of cross-examination of character witnesses. See *Michelson* v. *United States*, 335 U. S. 469.

it meets all other requirements of admissibility and no valid claim of privilege is raised against it.[14]   The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction.   We hold that the accused is entitled to the application of that rule, not merely because it will emphasize the contradiction to the jury, but because it will best inform them as to the document's impeaching weight and significance.[15] Traditional rules of admissibility prevent opening the door to documents which merely differ on immaterial matters.   The alleged contradictions to this witness' testimony relate not to collateral matters but to the very incrimination of petitioners.   Except the testimony of this witness be believed, this conviction probably could not have been had.   Yet, his first statement was that he got the film from Swartz; his first four statements did not implicate these petitioners and his fifth did so only after the judicial admonition we will later consider.   The weight to be given Marshall's implication of the petitioners was decisive.   Since, so far as we are now informed by the record, we think the statements should have been admitted, we cannot accept the Government's contention based on a premise that the court was free to exclude them.   It was error to deny the application for their production.

The second effort to impeach Marshall was to offer parts already quoted from the transcript of proceedings

---

[14] 3 Wigmore on Evidence, § 1037; 3 Wharton's Criminal Evidence (11th ed.) § 1309.

[15] The best evidence rule is usually relied upon by one opposing admission, on the ground that the evidence offered by the proponent does not meet its standards.   Its merit as an assurance of the most accurate record possible commends its extension to this unique situation where it is the proponent who seeks to rely on it.

in Detroit. Although Marshall admitted pleading guilty to the offense and that nine months later he was still unsentenced, he denied that he had received either promises or threats. The transcript would have shown the jury that a federal judge, who still retained power to fix his sentence, in discussing Marshall's expectation of a "recommendation for a lenient sentence or for probation" had urged him to tell all he knew, "even though it might involve others." Involvement of others, whom Marshall had not theretofore mentioned, soon followed. We think the jury should have heard this warning of the judge, which was an addition to the matter brought out on cross-examination. The question for them is not what the judge intended by the admonition, nor how we, or even they, construe its meaning. We imply no criticism of it, and he expressly stated that he was holding out no promise. But the question for the jury is what effect they think these words had on the mind and conduct of a prisoner whose plea of guilty put him in large measure in the hands of the speaker. They might have regarded it as an incentive to involve others, and to supply a motive for Marshall's testimony other than a duty to recount the facts as best he could remember them. Reluctant as we are to differ with an experienced trial judge on the scope of cross-examination, the importance of this witness constrains us to hold that the transcript was erroneously excluded.

We believe, moreover, that the combination of these two errors was sufficiently prejudicial to require reversal. The Government, in its brief, argues strongly for the widest sort of discretion in the trial judge in these matters and urges that even if we find error or irregularity we disregard it as harmless [16] and affirm the conviction. We

---

[16] Fed. Rules Crim. Proc., 52 admonishes us that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

are well aware of the necessity that appellate courts give the trial judge wide latitude in control of cross-examination, especially in dealing with collateral evidence as to character. *Michelson* v. *United States,* 335 U. S. 469. But this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony. Reversals should not be based on trivial, theoretical and harmless rulings. But we cannot say that these errors were unlikely to have influenced the jury's verdict. We believe they prejudiced substantial rights and the judgment must be

*Reversed.*